**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2506-17T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JANET E. COYLE,

     Defendant-Appellant.

_____

          Submitted February 25, 2019 – Decided April 12, 2019

          Before Judges Messano and Gooden Brown.

          On appeal from Superior Court of New Jersey, Law Division, Burlington County, Municipal Appeal No. 27-17.

          Albert P. Mollo, attorney for appellant.

          Scott A. Coffina, Burlington County Prosecutor, attorney for respondent (Nicole Handy, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following a trial de novo in the Law Division, defendant Janet Coyle was convicted of refusal to submit to a breath test, N.J.S.A. 39:4-50.4a; and failure to maintain a lane, N.J.S.A. 39:4-88(b). She was acquitted of driving while intoxicated (DWI), N.J.S.A. 39:4-50; and reckless driving, N.J.S.A. 39:4-96. She appeals from her refusal conviction,[1] raising the following single argument for our consideration:

> POINT I: [DEFENDANT] IS NOT GUILTY OF REFUSAL.

In support, she argues that her hearing impairment prevented her from hearing the officer's request to submit a breath sample or his explanation of the consequences of her refusal. We affirm.

---

[1] In order to obtain a conviction for refusal, the State must establish the following four elements beyond a reasonable doubt:

> (1) the arresting officer had probable cause to believe that defendant had been driving or was in actual physical control of a motor vehicle while under the influence of alcohol or drugs; (2) defendant was arrested for driving while intoxicated; (3) the officer requested defendant to submit to a chemical breath test and informed defendant of the consequences of refusing to do so; and (4) defendant thereafter refused to submit to the test.
>
> [State v. Marquez, 202 N.J. 485, 503 (2010) (citing N.J.S.A. 39:4-50.2(e); N.J.S.A. 39:4-50.4a(a); State v. Wright, 107 N.J. 488, 490 (1987)).]

2

The evidence presented at trial revealed that on September 21, 2016, at approximately 9:18 p.m., Evesham Township Sergeant Justin Graff conducted a motor vehicle stop of defendant's vehicle after observing various motor vehicle violations. Upon requesting her driving credentials, Graff noticed that defendant, then seventy-four years old, had "blood[shot]" and "watery" eyes. He also "detect[ed] an odor of . . . alcoholic beverage coming from inside of the vehicle," prompting him to ask defendant if she had consumed any alcohol prior to operating the vehicle. Defendant admitted "that she had a glass of wine at dinner at TGI Fridays[,]"[2] and Graff noted that defendant's speech was "slow and slurred."

Based on these observations, Graff administered field sobriety tests, which defendant was unable to perform. Prior to each test, Graff provided defendant with complete verbal instructions along with a demonstration of the test. According to Graff, at no point did defendant give him any indication that she was having trouble hearing him. When Graff inquired whether she had any injuries that would limit her ability to perform the tests, defendant responded

---

[2] Defendant later testified she had "two glasses of white wine" at dinner. Additionally, while she informed Graff she had consumed these glasses within a two-hour span, she testified she was at dinner for approximately four hours.

A-2506-17T3

"that she had some arthritis" in "her left foot." The entire encounter was recorded on Graff's mobile video recorder (MVR), which was played in court during the trial.

Defendant was arrested for DWI, read her Miranda[3] rights at the scene, and transported to the police station. At the police station, Graff read defendant, in its entirety, the New Jersey Attorney General's Standard Statement for Motor Vehicle Operators (standard statement),[4] advising her that she was required to submit breath samples for testing to determine alcohol content and would be issued a separate summons if she refused. When Graff asked if "she was willing to submit to the Alcotest . . . for breath testing," defendant replied that she wanted an attorney. Graff "immediately read [defendant] the second paragraph" of the standard statement, advising defendant that answering with anything other than "a yes or no answer" would require him to charge her with refusal.

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

[4] The standard statement advises the DWI suspect that he or she has been arrested for DWI; the law requires the submission of breath samples to test for alcohol content; a record of the test will be made; subsequent independent testing may be conducted at the suspect's expense; refusing to provide breath samples will result in the issuance of a separate summons for refusal; there are penalties for refusal; there is no legal right to have an attorney or physician or anyone else present, and no legal right to refuse to give or delay giving samples; and any ambiguous or conditional response will be treated as a refusal.

A-2506-17T3

Defendant again responded that she "want[ed] to talk to an attorney." Based upon defendant's responses, Graff issued defendant a motor vehicle summons for refusal to submit to a breath test[5] as well as other summonses.

Defendant testified that her "hearing impairment" prevented her from hearing "when [Graff] was reading all those things," but admitted she had no trouble hearing Graff and answering his questions when he initially spoke to her through the car window. She explained that she has "to wear . . . hearing aids" but was not wearing them when she was stopped because she had removed them in the restaurant due to "background noise." However, she acknowledged that she failed to inform Graff "that [she] was hearing impaired" or that she normally used hearing aids but did not have them on that night. She attributed her omission to the stress of the encounter.

Defendant testified further that she "never said no to a [b]reathalyzer," but instead only "ask[ed] for an attorney." She explained that she was "overwhelmed" and "confused about the [Miranda] rights being read to [her]" in relation to the standard statement because "nothing like this ha[d] ever happened

---

[5] At trial, the standard statement read to defendant and her recorded responses were admitted into evidence. When defendant was first asked to submit breath samples, her recorded response was, "[I'd] like an attorney[.]" When she was asked the second time, her recorded response was, "I can't talk to an attorney[?]"

to [her]" and "this was all new to [her.]"  According to defendant, when Graff first asked her to submit a breath sample,

> the thing I can best remember . . . is I was read my [Miranda] rights . . . right before he read that list of things . . . so I thought, . . . that's good because I'm so confused at this point and I thought it was saying that I was entitled to an attorney.
>
> So . . . I said to [the officer] well, can I have an attorney . . . .
>
> . . . I was confused about the [Miranda] rights being read to me . . . .
>
> . . . .
>
> . . . [H]e was reading me these things quickly and all that was sticking in my mind is . . . you can have an attorney to help you . . . .

Additionally, because she was in the process of "renewing" her "clinical license," she thought it would be "helpful if [she] could just talk to an attorney."

To support her defense, defendant presented expert testimony from Dr. Elizabeth Patterson, a doctor of audiology, who had been treating defendant since 2015 and diagnosed her with "moderate to severe sensorineural hearing loss," requiring defendant to wear "bilateral hearing aids to help compensate for that deficit."  Dr. Patterson explained that defendant's condition made it "significant[ly] difficult[] [to] understand[] speech, especially . . . consonants[.]"

6

She also stated that in recent testing, defendant "only understood [thirty-six] percent of . . . the standardized test words" presented "in a quiet situation[]," which "validate[d] the difficulty that [defendant was] having . . . when people talk at normal conversational levels." Dr. Patterson explained further that there are "cognitive strategies" employed "to compensate for the deficits in understanding[,]" which "require energy[,] . . . attention[,] and focus," all of which are compromised in "stressful situations" and would further reduce "that [thirty-six] percent understanding."

Immediately following the trial, the municipal court judge rendered an oral opinion, finding defendant guilty of all the charges based on the "totality of the circumstances." Regarding the refusal, the judge explained:

> [D]efendant said that she was confused because she had just been read the [Miranda] rights and then went into the refusal statement -- not really.
>
> The [Miranda] was read back at the scene, the refusal was read in the station. It wasn't [Miranda] read and then refusal, and I think the confusion with regard to those is because she was impaired and she started to get nervous about her certification, . . . and I think that it all came together and she just said I want an attorney.
>
> But then she's informed you don't have the right to do that at this stage, your answer is yes or no, will you submit. And then instead of saying yes or no, again she asks so I can't ask for a lawyer now? . . . .

> . . . I do find that she . . . heard and understood [the directions] because that's why she would be asking a question about it, because she heard what he said.
>
> He said answer yes or no and that's why she's -- wait, now I can't have an attorney? Because I've heard what you said. So again, I don't find that anybody is being misleading, I don't find that anybody is not telling the truth and she may have arthritis and she has a hearing loss.
>
> I just don't find that that's why she was driving in the center of the road, nor do I find that that's why she wasn't following directions, nor do I find that that's why she didn't take the Alcotest.

On appeal de novo, the Law Division judge made independent findings of fact and conclusions of law based on the record and gave deference to the municipal judge's credibility determinations. After weighing the evidence "de novo[,]" the judge had reasonable doubt as to the DWI charge. However, he found "[t]he police officer . . . had probable cause . . . to believe that . . . defendant may be operating a motor vehicle under the influence of alcohol," and arrested defendant for DWI, which triggered the requirement to "take a . . . breath test if . . . asked to do so under these circumstances." Further, the judge found beyond a reasonable doubt that defendant was read and understood the standard statement, but gave a response that constituted a refusal under the statute.

The judge explained "[t]his is a person who has given me no evidence to . . . suggest that she didn't understand that rather clear, unequivocal language that you have to give a 'yes' or 'no[.]' You can refuse and you will be penalized[,] or you must submit to the test." The judge pointed out that defendant gave no "indication[]" that she did not hear the officer and "had no difficulty answering the officer's questions," which "support[ed his] finding that she understood him." According to the judge, "[t]here did not appear to be any communication problems. She spoke clearly to him and understood the conversation between the two of them[.]"

In distinguishing Marquez, the judge stated:

> [T]his is not a Marquez case; this is not a Spanish or a Polish or a Hungarian; this is a professional English-speaking, licensed therapist . . . .
>
> . . . .
>
> I don't buy the argument that . . . she didn't understand. Even with the matching up with the [Miranda], which was read earlier, . . . I don't find that [defendant] had any kind[] of problems understanding what she was required legally to do.

The judge imposed the requisite fines and penalties, as well as a seven-month revocation of defendant's driving privileges, which the judge stayed for forty-five days. This appeal followed.

A-2506-17T3

Our review of the trial court's factual findings is limited to whether the conclusions of the Law Division judge "could reasonably have been reached on sufficient[,] credible evidence present in the record." State v. Johnson, 42 N.J. 146, 162 (1964). Unlike the Law Division, we do not independently assess the evidence. State v. Locurto, 157 N.J. 463, 471 (1999). The rule of deference is more compelling where, as here, the municipal and Law Division judges made concurrent findings. Id. at 474. "Under the two-court rule, appellate courts ordinarily should not undertake to alter concurrent findings of facts and credibility determinations made by two lower courts absent a very obvious and exceptional showing of error." Ibid. "However, no such deference is owed to the Law Division or the municipal court with respect to legal determinations or conclusions reached on the basis of the facts." State v. Stas, 212 N.J. 37, 49 (2012).

Based upon these principles and our review of the record, we are satisfied that the Law Division judge's finding of guilt could reasonably have been reached on sufficient, credible evidence present in the record. Under the implied consent statute, N.J.S.A. 39:4-50.2(a), each motorist using the public roads in the State is deemed to have given consent to undergo a chemical test to determine blood alcohol levels at the request of a police officer who has

10

reasonable grounds to believe that a motorist has been operating a motor vehicle while under the influence of alcohol. State v. Mulcahy, 107 N.J. 467, 474 (1987). A motorist who fails to submit to a breath test when requested to do so will be charged with refusal under N.J.S.A. 39:4-50.4a, triggering a mandatory suspension of the motorist's driving privileges.

A police officer's request to a motorist to submit to a breath test is statutorily mandated. N.J.S.A. 39:4-50.2(e) provides that "[t]he police officer shall . . . inform the person arrested of the consequences of refusing to submit to such test in accordance with [N.J.S.A. 39:4-50.4a]" and "[a] standard statement . . . shall be read by the police officer to the person under arrest." The Legislature authorized the standard statement as a procedural device to inform motorists of "the mandatory nature of the [breath] test, their limited rights to counsel for purposes of the test, and the need for unequivocal, affirmative consent." State v. Widmaier, 157 N.J. 475, 489 (1999). Ultimately, "'anything substantially short of an unconditional, unequivocal assent to an officer's request' 'would undermine law enforcement's ability to remove intoxicated drivers from the roadways' and impede their ability to conduct the test in a timely manner to ensure that the results are meaningful." State v. Spell, 395 N.J. Super.

337, 344 (App. Div. 2007) (quoting Widmaier, 157 N.J. at 497), aff'd as modified, 196 N.J. 537 (2008).

Here, upon defendant's arrest for DWI, and after being advised of her Miranda rights, Graff followed, to the letter, the proper procedures for informing defendant of her obligation to submit to a breath test by reading, in its entirety, the standard statement as required under N.J.S.A. 39:4-50.2(e). By responding that she wanted an attorney and failing to heed Graff's warnings, defendant failed to give the unequivocal consent required to avoid the proscription of the refusal statute.

Defendant argues that she "should have no less protection under the law" because of "a hearing impairment" than the Marquez defendant "who did not understand because of a language barrier[,]" particularly when "there is an abundance of evidence to demonstrate" that she "did not understand the request to submit a breath sample or consequences related to her failure to do so." In Marquez, the Court held that a suspected drunk driver who did not speak English was not "inform[ed] of the consequences of refusal" when the police officer read the standard statement to the defendant in English. 202 N.J. at 514.

Here, as the Law Division judge concluded, Marquez is distinguishable because there is substantial, credible evidence in the record that defendant heard

and understood the clear and unequivocal language read to her from the standard statement that any response other than a "yes" or a "no" constituted a refusal and would result in the issuance of a separate summons. Indeed, defendant admitted she had no trouble hearing Graff when he initially approached her vehicle. Had the evidence supported her account that her hearing impairment prevented her from "being informed" of the consequences of refusal, Marquez may have applied by analogy.

Instead, the evidence showed that defendant was confused and wanted to talk to an attorney, particularly regarding the impact of the arrest on her professional license. However, "it is not necessary for the State to prove that a driver actually understood the warnings on a subjective level." Id. at 513. Indeed, "defendant's subjective intent is irrelevant in determining whether the defendant's responses to the officer constitute a refusal to take the test" and "voicing a mere 'preference' to have an attorney present, as defendant in the instant case argues [s]he did, is a delay tactic that cannot be indulged." Widmaier, 157 N.J. at 498. "If properly informed in a language they speak or understand while sober, [as here,] drivers can be convicted under the implied consent and refusal statutes." Marquez, 202 N.J. at 513.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION